JESSE L. LASKY FEATURE PLAY CO., Inc., v. CELEBRATED PLAYERS'
FILM CO.

(District Court, S. D. New York. May 19, 1914.)

1. CONTRACTS (§ 350*)—ACTIONS—SUFFICIENCY OF EVIDENCE.

In an action involving a contract for the exclusive privilege of exhibiting certain moving picture films in certain states, which provided that, if such films were not passed by municipal authorities because of objectionable scenes which might be eliminated without materially injuring the production, the lessee should be required to accept them, evidence *held* to show that the "cut-outs" ordered by municipal authorities materially injured the production.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1819–1823; Dec. Dig. § 350.*]

2. CONTRACTS (§ 299*)—BREACH—DELAY IN ACCEPTANCE.

A contract, granting the exclusive privilege of exhibiting a series of moving picture films in certain states, provided that, if any of the films

were not passed by the Chicago municipal authorities because of objectionable scenes which might be eliminated without material injury, the lessee should be required to accept them and might elect to accept them, notwithstanding the refusal of such authorities to license the exhibition thereof, but that if the authorities should refuse to permit the exhibition, and the lessee should refuse to accept the film, the lessor might sell to other parties. On April 14th, the Chicago authorities ordered certain "cut-outs" from one of such films, and on April 15th a set of the films with a memorandum of the "cut-out" requirements were delivered to the licensee, who, believing in good faith that the eliminations would materially injure the production, took the matter up with the deputy superintendent of police and was informed that a further investigation would be made. On April 17th, the licensor wired its attorneys in Chicago to see that the licensee accepted the films the following day at the latest, and on April 20th it granted rights to produce the films to another party. *Held*, that the facts showed a breach of the contract by the licensor, and not by the licensee, who apparently did everything to keep the contract in force' that reasonable conduct would require.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1372–1381, 1394, 1395; Dec. Dig. § 299.*]

3. INJUNCTION (§ 59*)—BREACH OF CONTRACT—EQUITABLE RELIEF.

Where a manufacturer of moving picture films, which had granted an exclusive right to exhibit such films in certain territory, broke the contract by granting a right to exhibit the films to another party, the licensee had no adequate remedy at law and was entitled to equitable relief.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 114–116, 128; Dec. Dig. § 59.*]

In Equity. Suit by the Jesse L. Lasky Feature Play Company, Incorporated, against the Celebrated Players' Film Company. On motion by each party for an injunction. Defendant's motion granted.

Wise & Lichtenstein, of New York City (Arthur S. Friend, of New York City, of counsel), for plaintiff.

Nathan Burkan, of New York City, for defendant.

MAYER, District Judge. Plaintiff is a manufacturer, importer, and dealer in films of moving pictures, including motion pictures founded on well-known dramas and novels.

[1, 2] On January 23, 1914, plaintiff entered into a written agreement with the defendant wherein it was recited that plaintiff planned to produce, import, and deal in a series for the year beginning March 1, 1914, consisting of ten films more or less, which films would be known as "The 1914 Special Service of the Jesse L. Lasky Play Co., Inc.," and whereby it was agreed that plaintiff let or licensed to defendant the sole and exclusive privilege of exhibiting the films of this 1914 Service in the states of Illinois, Wisconsin, and Indiana. The Service was to include "The Squaw Man" with Dustin Farnum and "Brewster's Millions" with Edward Abeles in the respective leading roles. Defendant agreed to pay $5,700 for each production, in cash, on the delivery by plaintiff to defendant in the city of Chicago of three sets of positive prints of each of the film productions. It was further provided:

"That if any of said films are not passed by such municipal authorities because of objectionable scene or scenes, and such scene or scenes may be elim-

inated or modified without materially injuring said production, then the lessee shall be required to accept the same. If, notwithstanding, the refusal, of the municipal authorities of the city of Chicago to license the exhibition of any such production the lessee elects, nevertheless, to receive and accept the same, than it shall pay for such production the amount herein above agreed in such manner as though the production of such film had been licensed by such municipal authority. Provided, further, that if said municipal authority shall refuse to permit the exhibition of such production in the city of Chicago and the lessee refuses to accept the same, then as to such production so rejected by the municipal authority the lessor shall have the right to sell the said production for exhibition in said granted territory to any other person that it may elect, without affecting, however, the respective rights and obligations of the parties hereto in reference to any other production covered by this contract."

The first photo play film duly delivered to defendant was "The Squaw Man," and the purchase price of $5,700 was duly paid therefor. The difference between the parties arose at the time of the receipt at Chicago of the second of the series, which was "Brewster's Millions." Three sets of positive prints of this photo play each containing five reels were received at Chicago on April 13, 1914, by Messrs. Hirsch & Schwartz, the Chicago attorneys of plaintiff. On the following day these attorneys took one of the prints to the office of Maj. Funkhouser, second deputy superintendent of police of the city of Chicago, who is the official who has charge and supervision of the censoring of motion pictures and the issuance of permits allowing their exhibition. The business of exhibiting motion pictures in the city of Chicago is very extensive, often requiring the inspection of many reels each day, so that it is impossible for any single individual to inspect all of such proposed pictures. The result is that the mayor of Chicago, pursuant to authority duly conferred upon him, has appointed assistants to the general superintendent of police who are colloquially known as "censors." The censors witness the screen examination of the film productions and submit to Maj. Funkhouser their report with their recommendations. This board of censors examined the positive prints of "Brewster's Millions" in executive session on April 14, 1914, and one of its members handed to the Chicago attorneys a memorandum of so-called "cut-outs" upon the making of which the board would recommend the issuance of a permit.

By "cut-outs" is meant that part or parts of the play required to be eliminated before its production would be permitted in the city of Chicago.

That afternoon Mr. Hirsch got into telephone communication with Mr. Hartmann, also a Chicago attorney and an officer of the defendant. Mr. Hartmann told Mr. Hirsch that the defendant desired to "run off" (meaning thereby to examine) the pictures and would do so on the following afternoon. The next afternoon (April 15th), Mr. Hirsch delivered to some one in charge of the office of the defendant one set of the "Brewster's Millions" films together with a memorandum of the so-called "cut-out" requirements. These "cut-outs" were of certain scenes in three of the reels and involved four incidents.

On April 17th, Messrs. Hirsch & Schwartz received a telegram from their client, the plaintiff, inquiring as to delay of acceptance. To this the Chicago attorneys replied that defendant was trying to have the

"cut-outs" diminished and desired a "couple" of days. The same day plaintiff telegraphed Messrs. Hirsch & Schwartz to see that defendant accepted the reels the following day at the latest. This was succeeded on April 18th by a telegram from plaintiff to their Chicago attorneys that defendant must accept and pay for the picture that day or that the Chicago attorneys must return the picture to New York immediately.

The affidavits are convincing that defendant was anxious to have this play of "Brewster's Millions," and did everything that fair dealing business men would be expected to do, and made every reasonable effort to urge that the play be permitted without the eliminations required by the Chicago officials. Maj. Funkhouser stated (in his affidavit verified April 29, 1914) that on April 16, 1914, Mr. Hartmann, representing defendant, discussed with him the subject-matter of the picture and objected to the "cut-outs," and that thereupon he (Funkhouser) did not indicate or advise Hartmann that the recommendations of the censors in reference to the "cut-outs" were a final determination, but, on the contrary, that he then and there stated to Hartmann that he would make a further investigation of "Brewster's Millions" and confer with the corporation counsel in reference thereto, and would then advise Hartmann as to his conclusion. Hartmann's point was, when the censored scenes were considered with the context of the play, that it would be manifest that neither the purpose nor the representation was evil, but both were consistent with the farcical theme and character of the play.

On April 20th, however, the plaintiff company entered into a contract with Famous Players' Film Service, Inc., a competitor of defendant, for the production of this same play of "Brewster's Millions" in the same states of Illinois, Indiana, and Wisconsin. This contract of April 20th, according to the affidavits presented on behalf of defendant, was the result of negotiations that were opened upon the morning of April 20th; the Famous Players' Service having already a contract with plaintiff for Pennsylvania. The affidavits of the treasurer of that company and of Lasky, president of plaintiff, state that the Famous Service agreed to pay and did pay $5,700 for "Brewster's Millions" for Illinois, Indiana, and Wisconsin.

The contract between plaintiff and the Famous Players' Service clearly indicates that plaintiff had a grave doubt as to what the courts might say as to the alleged breach by the defendant herein of its contract with the plaintiff. The contract is further informing because it discloses that plaintiff and the Famous Players' Service had already a contract covering considerable additional territory. Further, the contract clearly apprised the Famous Players' Service that there was a question as to plaintiff's right to enter into the contract covering "Brewster's Millions."

I have no doubt that defendant company honestly believed that these eliminations materially injured the production. With the correctness or propriety of the decision of the Chicago officials this court has no concern.

What shall or shall not be permitted in the city of Chicago is a matter to be regulated by its own citizens under such ordinances or official

supervision as the people of the city of Chicago may determine. When therefore I refer to the question of "material injury," I am speaking solely from the play production standpoint as the same is disclosed in the papers and as may be ascertained from an actual witnessing of the play.

This play of "Brewster's Millions" is founded on the book of the same name by George Barr McCutcheon, a well-known novelist. The play is intended to afford amusement. Brewster, the paternal grandfather of "Monty" Brewster, bequeaths a million dollars to "Monty." An uncle dies leaving "Monty" $7,000,000 contingent upon his getting rid, within a year, of the $1,000,000 left by Grandfather Brewster. The play is largely taken up with "Monty's" attempts to spend the $1,000,000 and his uniform luck, so that he cannot succeed in spending his money. One of the basic points is to constantly create laughter by the queer adventures of Brewster, the central figure, and three of the eliminated scenes are manifestly intended for that purpose. An abduction scene is part of an incident obviously intended to introduce a little heroism into the situation, while the other three scenes were meant to carry out the farcical incidents which run throughout the production.

As requested by counsel, I saw the play as produced at a theater in New York City without the eliminations recommended by the Chicago censors. I can readily understand the point of view which required the "cut-out" of part of the prize fight and of the scene at Monte Carlo. The so-called "hold-up" scene, however, was treated by the audience as amusing and elicited laughter, and the scene on the yacht was, as it seemed to me from a play production standpoint, necessary to the incident or adventure of which it was a part.

I gather from the affidavit of Maj. Funkhouser that he is a fairminded official, and that he would have taken under consideration the application for a modification of the recommendation of the censors in order to arrive at a decision, which would be just to the producer on the one hand, and consistent with the policy of the city of Chicago on the other. But, as has already been indicated, plaintiff was in too much of a hurry to allow any reasonable opportunity for further consideration by the Chicago officials.

From the play production standpoint there may be some fair difference of opinion as to the elimination of the prize fight and Monte Carlo scenes; but the so-called "hold-up" scene is a part of the incident revolving around the man Coolan, and the "gagging" scene is preliminary and essential to the rescue of "Peggy," which is intended to be an exciting affair.

Interpreting the contract between the parties as it was meant by them to be construed, at least these two "cut-outs" resulted in a material injury to the production.

Two affidavits (Sherry and Steele) offered by the plaintiff are interesting on this point. William L. Sherry, who is the executive head of a film company, acquired from plaintiff the license to exhibit "Brewster's Millions" in the state of New York. His affidavit is in some respects illuminating. He says of one "cut-out" that "it is of no great

value." He speaks of another as "amusing," but that "no great harm is done" by its elimination. Of a third, he states that "the elimination * * * does not greatly injure the picture." He says that. "cutting out" the abduction scene does not "injure the picture to any material extent."

It will be noted that, in effect, he states that three out of four "cut-outs" will result in some injury, and he falls just short of saying that the abduction scene results in material injury.

It was interesting to me to observe in the lobby of the theater to which the Sherry Company (according to the imprint) had licensed the play, that there was prominently displayed a photograph of one of the "cut-out" scenes.

If Mr. Sherry's judgment is sound, the best way to demonstrate the fact is for Mr. Sherry henceforth to eliminate these scenes from the productions over which he has control in the state of New York, and if, when the time comes for final hearing, he shall have eliminated these scenes, that fact may be of some persuasive value.

Mr. Steele of the Famous Players' Company may perhaps fortify the plaintiff's case at final hearing, if outside of the city of Chicago he will also eliminate the scenes objected to by the Chicago censors.

What men do is always much more indicative of their purpose than what they say, and I am satisfied, on the papers before me, that plaintiff considered these scenes as desirable and important from the motion picture point of view, and this is well illustrated by the advertising matter of plaintiff.

Without analyzing the affidavits further in detail, I may say that it seems to me that plaintiff was only too anxious to get matters into a situation where a breach of contract might be forced, and that defendant was anxious to have the contract kept in force, and did everything to that end that reasonable conduct would require. It is the plaintiff and not the defendant which has breached the contract.

[3] It is urged that defendant has an adequate remedy at law, but I cannot agree with this contention. I think the case is properly on the equity side as to the counter controversies, and that equitable relief is the only relief which will fully protect defendant.

Plaintiff insists that an injunction as to "Brewster's Millions" will be of no practical service. If plaintiff is correct, then an injunction will not do any harm.

The motion of plaintiff for an injunction against defendant as to "The Squaw Man" is denied. The motion of defendant for an injunction against plaintiff is in all respects granted; but, so far as affects "Brewster's Millions," the injunction may be suspended on the giving of a bond.

One of the reasons for suspending the injunction is that the order to be made herein cannot be reviewed until the fall. The amount of the bond will be considered on the settlement of the order.

In order, however, that plaintiff may have a trial promptly, the case will be preferred on the equity calendar and set down for the first Monday of October, 1914.

Settle order on two days' notice.